IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| MILENE R. CHOROVICH, <br><br> Plaintiff, <br><br> vs. <br><br> CAROLYN W. COLVIN, <br> Acting Commissioner of Social Security, <br><br> Defendant. | **REPORT AND RECOMMENDATION** <br><br> Case No. 2:14-cv-00933-RJS-EJF <br><br> District Judge Robert J. Shelby <br><br> Magistrate Judge Evelyn J. Furse |

Plaintiff Milene R. Chorovich filed this action asking the Court[1] to reverse or remand the final agency decision denying her disability insurance benefits under Title II of the Social Security Act. *See* 42 U.S.C. §§ 401–434. In the proceedings below, the Administrative Law Judge ("ALJ") determined that Ms. Chorovich did not qualify as disabled within the meaning of the Act because the ALJ found Ms. Chorovich retains the ability to perform other work existing in significant numbers in the national economy. (Admin. R. 20–21, certified copy tr. of R. of admin. proceedings: Milene R. Chorovich (hereinafter "Tr. __"), ECF No. 16.) Having carefully considered the record, the parties' memoranda, and relevant legal authorities,[2] the undersigned RECOMMENDS the Court affirm the Commissioner's decision as supported by substantial record evidence.

---

[1] On May 6, 2015, Judge Robert J. Shelby referred this case to the undersigned Magistrate Judge under 28 U.S.C. § 636(b)(1)(B).

[2] Pursuant to Civil Rule 7-1(f) of the Rules of Practice for the United States District Court for the District of Utah, the undersigned finds oral argument unnecessary and will determine the appeal on the basis of the written memoranda.

## PROCEDURAL HISTORY

In June 2012, Ms. Chorovich filed an application for disability insurance benefits, alleging a disability onset date of September 21, 2010.  (Tr. 227–35.)  Ms. Chorovich had previously filed applications for disability insurance benefits and for supplemental security income, which an ALJ denied on September 20, 2010.  (Tr. 12.)  Due to this prior determination, Ms. Chorovich has an administratively imposed alleged disability onset date of no earlier than September 21, 2010.  (Pl.'s Br. 2 n.3, ECF No. 22.)

The Social Security Administration denied Ms. Chorovich's current claim initially and on reconsideration.  (Tr. 111–19, 121–27.)  On June 4, 2014, an ALJ conducted a hearing, (tr. 27–53), and shortly thereafter issued a decision finding Ms. Chorovich not disabled within the meaning of the Act, (tr. 12–21).  The Appeals Council denied Ms. Chorovich's request for review on October 31, 2014, (tr. 1–6), making the ALJ's decision the Commissioner's final decision for purposes of judicial review under 42 U.S.C. § 405(g).  *See* 20 C.F.R. § 404.981.

## FACTUAL BACKGROUND

Ms. Chorovich, born on December 20, 1969, (tr. 30), has past relevant work experience as a day care worker.  (Tr. 20.)  Ms. Chorovich alleges that a combination of severe impairments render her disabled as defined by the Act:  "fibromyalgia, lumbar/lumbosacral disc degeneration, migraine headaches, insomnia, osteoarthritis, worse in the hands and knees, cardiac arrhythmia with defibrillator, cardiac dysrhythmia, ventricular tachycardia, paresthesia of the left hand, knee pain, hypertension, hyperlipidemia, generalized anxiety disorder with panic attacks, and depression."  (Tr. 137.)

Because the ALJ's decision and the parties' briefs present a detailed picture of the facts in this case, the undersigned summarizes only the evidence relevant to the issues on appeal.

2

### A.   Medical Evidence

Ms. Chorovich challenges the weight the ALJ gave three of her treating physicians – Dr. George L. Cholak, Dr. Michael F. Sayegh, and Dr. David G. Stainbrook – as compared to the weight he gave the non-examining state agency medical consultants.  (Pl.'s Br. 15–20, ECF No. 22.)

#### a.   Dr. Cholak

Dr. Cholak treated Ms. Chorovich since 1981.  (Tr. 475.)  Dr. Cholak's earliest treatment records in evidence date from 2009.  (Tr. 465–66.)  Between then and her onset date, Ms. Chorovich went to Dr. Cholak for several visits to treat Ms. Chorovich's chronic medical problems.  (Tr. 449–66.)  Ms. Chorovich presented with complaints of migraine headaches, (tr. 466, 462, 460, 456, 454, 452), knee and joint pain, (tr. 466, 464, 462, 460, 450), occasional episodes of chest discomfort or pain, particularly at the defibrillator site, (tr. 466, 464, 462, 460, 458), shortness of breath (tr. 464, 462, 460, 458), trouble sleeping, (tr. 466, 464, 462, 460, 458, 454, 452), all over achiness, (tr. 456), and decreased range of motion in left arm, (tr. 460, 450). During a physical examination on August 27, 2010, Dr. Cholak diagnosed Ms. Chorovich with hypertension, generalized anxiety disorder with panic attacks, depression, migraine headaches, insomnia, cardiac arrhythmia with defibrillator, nicotine abuse, alcohol abuse, and knee pain. (Tr. 449-450.)  Dr. Cholak also noted that an x-ray of Ms. Chorovich's knees "really did not show any abnormalities."  (Tr. 450; *see* tr. 470 (noting "intact skeletal structures and joint spaces").)

These diagnoses remained mostly the same with the absence of nicotine and alcohol abuse, post onset date, in December 2010.  (Tr. 447–48.)  After the physical exams, Dr. Cholak often recommended Ms. Chorovich modify her diet and exercise, referred her to specialists,

and/or adjusted her prescriptions to treat anxiety, depression, and insomnia. (*See, e.g.*, tr. 465, 461, 457, 455, 451, 449, 447.) In February 2011 and June 2011, Dr. Cholak added generalized osteoarthritis, primarily in the hands and knees, to Ms. Chorovich's diagnoses. (Tr. 445, 443.) In addition, Dr. Cholak noted that Ms. Chorovich had some episodes of falling down. (Tr. 446, 443.)

In August 2011, Dr. Cholak treated Ms. Chorovich for an injury to her right ankle. (Tr. 434.) Dr. Cholak told Ms. Chorovich to take the previously prescribed Percocet to treat her pain. (Tr. 439.) On October 10, 2011, Ms. Chorovich had continued ankle pain. (Tr. 421.) Dr. Cholak's physical examination revealed several musculoskeletal issues, (tr. 427), and Dr. Cholak diagnosed fibromyalgia and lumbosacral disc degeneration for the first time without explanation. (Tr. 428–29.) Dr. Cholak found Ms. Chorovich's neurological and other physical systems normal. (Tr. 425–28.) These findings remained consistent in the November 2011 and March 2012 follow up visits. (Tr. 412–20, 402–10.)

On March 5, 2012, Dr. Cholak completed a Multiple Impairment Questionnaire. (Tr. 538–45.) Dr. Cholak listed Ms. Chorovich's diagnoses of fibromyalgia, osteoarthritis, cardiac arrhythmia, migraines, generalized anxiety disorder, and depression and stated that he based the diagnoses on clinical findings of anxiety, depression, all-over achiness, chest pain, and headaches. (Tr. 538.) Dr. Cholak stated that he did not expect Ms. Chorovich's condition to improve. (*Id.*) Dr. Cholak listed Ms. Chorovich's primary symptoms as pain, weakness, fatigue, and decreased sensation and noted that she had exhibited the symptoms for years. (Tr. 539, 544.) Dr. Cholak described Ms. Chorovich's pain as all-over, severe, and burning. (Tr. 539.) In describing Ms. Chorovich's functional limitations, Dr. Cholak opined that Ms. Chorovich could sit for one hour total and stand/walk for up to one hour total in an eight-hour workday, (tr. 540);

4

that Ms. Chorovich must get up and move around every thirty minutes for ten minutes at a time, (tr. 540–41); that Ms. Chorovich could never lift or carry anything, (tr. 541); that Ms. Chorovich had marked limitations in grasping, turning, or twisting objects, using her fingers or hands for fine manipulations, and using her arms for reaching, including overhead, (tr. 541–42); that Ms. Chorovich constantly experienced pain, fatigue, or other symptoms severe enough to interfere with her attention and concentration, and identified anxiety and depression as contributing factors, (tr. 543); that Ms. Chorovich could not function under even "low stress" in the workplace, (*id.*);  and that Ms. Chorovich would likely miss work more than three times per month due to her impairments or treatments, (tr. 544).  In December 2012, Dr. Cholak opined that Ms. Chorovich would not be "employable at any occupation in the near future or in the far future."  (Tr. 381.)

Starting in May 2012 and continuing through October 2013, Dr. Cholak's treatment notes show that Ms. Chorovich's musculoskeletal issues improved to normal, with some crepitus and unspecified osteoarthritic changes, and that Ms. Chorovich continued to have a normal range of motion in her neck and back, full strength throughout her body, normal reflexes and sensation, and that she could walk and stand normally.  (Tr. 396–400, 385–90, 567–70, 573–76, 580–84, 590–93.)

Dr. Cholak's second questionnaire, completed in August 2013, did not contain significant changes from the March 2012 questionnaire.  (*See* tr. 475–82.)  Dr. Cholak added diagnoses of hypertension and hyperlipidemia.  (Tr. 475.)  Dr. Cholak noted Ms. Chorovich's blood pressure was only fairly controlled, and Ms. Chorovich had an unstable cardiac arrhythmia.  (*Id.*)  Changing his earlier opinion, Dr. Cholak observed Ms. Chorovich could lift or carry up to five pounds occasionally.  (Tr. 478.)  Dr. Cholak did not estimate how often Ms. Chorovich would

likely miss work due to her impairments or treatments.  (Tr. 481.)  Dr. Cholak also opined that

Ms. Chorovich's symptoms and limitations began as early as 2001.  (*Id.*)

### b.  *Dr. Stainbrook*

Dr. Stainbrook, a rheumatologist, treated Ms. Chorovich three times for "all day" pain in

her hands, wrists, knees, ankles, fingers, and back.  (Tr. 322; *see* tr. 320–23.)  In August 2011,

Dr. Stainbrook saw Ms. Chorovich for the first time and observed she had decreased extension in

the cervical spine, asymmetrical internal shoulder rotation, and a positive Tinel's sign in both

wrists.  (*Id.*)  Dr. Stainbrook found migraine headaches; severe pain in the hands, wrists, back,

knee, ankle, and foot; carpal tunnel syndrome; and fibromyalgia, among other things.  (*Id.*)  Dr.

Stainbrook prescribed Naprelan (Naproxen) and bilateral wrist splints.  (*Id.*)  Dr. Stainbrook

noted that "generalized stretching, aerobic exercise, and physical therapy would be the

cornerstone of treatment," but Ms. Chorovich declined a referral to formal physical therapy.  (Tr.

322–23.)  Dr. Stainbrook also arranged for an EMG/nerve conduction study at Ms. Chorovich's

request.  (Tr. 322.)  That study revealed normal results.  (Tr. 527–28.)  Nonetheless, Dr.

Stainbrook continued to list clinical bilateral carpal tunnel syndrome without explanation in Ms.

Chorovich's two follow up visits.  (Tr. 320–21.)

The follow up visits in September 2011 and February 2012 show additional diagnoses of

degenerative disc disease/osteoarthritis of the lumbar spine and chronic bilateral bursitis, among

others.  (Tr. 320–21.)  During these visits, Dr. Stainbrook referred Ms. Chorovich to an

orthopedist for evaluation of her knee pain and recommended Ms. Chorovich seek evaluations in

hematology/oncology, podiatry, chronic pain management, and spinal surgery, among other

recommendations.  (*Id.*)  Ms. Chorovich continued to decline physical therapy.  (*Id.*)  X-rays

taken after August 2011 showed only "mild degenerative change" in the lumbar spine, and no

6

fractures or bony destructive process present otherwise, as well as fairly well-preserved joint spaces in the feet, hands, and knees.  (Tr. 510–16.)

During Ms. Chorovich's February 2012 visit, Dr. Stainbrook completed an Arthritis Impairment Questionnaire.  (Tr. 499–506.)  Dr. Stainbrook noted diagnoses of osteoarthritis and fibromyalgia and stated that Ms. Chorovich's prognosis was poor.  (Tr. 499.)  Dr. Stainbrook found Ms. Chorovich markedly limited in using her left arm for reaching, including overhead, and moderately limited in using her left hand for grasping, turning, and twisting objects, (tr. 501); Ms. Chorovich did not have significant limitations in doing repetitive reaching, handling, fingering, or lifting, (*id.*); Ms. Chorovich could sit for a total of four hours and stand/walk for a total of four hours in an eight-hour workday, (tr. 502); and Ms. Chorovich should not sit continuously in a work setting but get up and move around every fifteen minutes for thirty minutes each time, (*id.*); and Ms. Chorovich could frequently lift and/or carry up to five pounds but never more, (tr. 503).  Dr. Stainbrook opined that Ms. Chorovich's symptoms and limitations are not reasonably consistent with her physical impairments described in the evaluation.  (Tr. 503–04.)  Dr. Stainbrook noted that Ms. Chorovich's pain, fatigue, and other symptoms constantly interfered with her attention and concentration, and she could not tolerate even "low stress" in the workplace, (tr. 504); Ms. Chorovich would require unscheduled breaks while working every thirty minutes for fifteen minutes at a time, (tr. 505); and Ms. Chorovich would likely miss work more than three times per month as a result of her impairments or treatments, (*id.*).  Dr. Stainbrook indicated that these symptoms and limitations existed prior to August 23, 2011, when he first saw Ms. Chorovich.  (*Id.*)

c.   *Dr. Sayegh*

Dr. Sayegh, a pain management specialist, treated Ms. Chorovich between January 2013 and September 2013 for chronic pain in her head, neck, right arm, mid-back, low back, right leg, and left leg.  (Tr. 548–56.)  Dr. Sayegh's physical examination in January 2013 revealed that Ms. Chorovich had trigger points and tenderness in the paraspinal muscles.  (*Id.*)  Dr. Sayegh also conducted a neurological examination of Ms. Chorovich's upper and lower extremities that showed "moderate decreased sensation in bilateral arms and hands, worse on the left side," and "moderate to severe decreased sensation and decreased tendon reflexes in bilateral lower extremities, worse on the right side."  (*Id.*)  Dr. Sayegh's examination of Ms. Chorovich's hips and knees showed increased pain and tenderness with active and passive movement.  (*Id.*)  Ms. Chorovich's straight leg test was severely positive on the right and moderately positive on the left.  (*Id.*)  Dr. Sayegh diagnosed Ms. Chorovich with various conditions of neck, back, leg, and spine pain, as well as conditions previously diagnosed by Dr. Cholak.  (Tr. 556–57.)  Dr. Sayegh prescribed Ms. Chorovich two lumbar spine steroid injections.  (Tr. 557.)  During follow up visits in February, June, July, and September 2013, Dr. Sayegh did not note any significant changes in the physical findings.  (Tr. 554, 552, 550, 548.)  Dr. Sayegh prescribed Percocet for Ms. Chorovich's chronic pain, as well as more steroid injections to address her increased lower back pain and sciatica.  (*Id.*)

On December 5, 2013, Dr. Sayegh completed a Multiple Impairment Questionnaire.  (Tr. 491–98.)  Dr. Sayegh noted his findings and observed Ms. Chorovich's prognosis as fair.  (Tr. 491.)  Dr. Sayegh stated that his clinical exams found trigger points of the neck and lower back, bilateral tenderness of the paraspinal muscles, moderate to severe decreased sensation in all four extremities, increased pain and tenderness with movement in the bilateral hips, knees, and

8

shoulders, and a moderately positive left straight leg raise.  (*Id.*)  Dr. Sayegh cited the August

2011 x-rays in support of his conclusions.  (Tr. 492.)  Dr. Sayegh rated Ms. Chorovich's pain as

moderately severe and affected by weather changes, activities of daily living, and environmental

factors.  (Tr. 493.)  Dr. Sayegh opined that Ms. Chorovich could sit for four hours total and

stand/walk for four hours total in an eight-hour workday, (tr. 493); that Ms. Chorovich needed to

get up and move around every thirty to sixty minutes for about fifteen minutes, (tr. 493–94); and

that Ms. Chorovich could frequently lift/carry up to five pounds, and occasionally lift/carry up to

ten pounds, but never more, (tr. 494).  Dr. Sayegh noted that Ms. Chorovich had significant

limitations doing repetitive reaching, handling, fingering, and lifting due to decreased sensation

in bilateral arms and hands, and Ms. Chorovich could not push, pull, lift, or reach above her head

depending on the severity of her condition that day.  (*Id.*)  Dr. Sayegh also noted Ms. Chorovich

experienced moderate limitations in her ability to grasp, turn, and twist objects, use her

fingers/hands for fine manipulations, and use her arms for reaching.  (Tr. 494-95.)  Finally, Dr.

Sayegh opined that Ms. Chorovich's chronic pain, fatigue, and other symptoms constantly

interfered with her attention and concentration, and she could not perform under even "low

stress" in the workplace due to her anxiety, depression, and severe chronic pain, (tr. 496); that

Ms. Chorovich would need to take unscheduled breaks every one to two hours for fifteen to

thirty minutes each time during an eight-hour workday, (*id.*); and that Ms. Chorovich would

likely miss work more than three times a month as a result of her impairments or treatments, (tr.

497).

### B.  Ms. Chorovich's Testimony

At the hearing, Ms. Chorovich testified that she lives with her husband and cannot work

because of various health issues.  (Tr. 34–42.)  Ms. Chorovich had a pacemaker implanted in

2001 but continues to report heart problems including shortness of breath, racing heart rate, and chest pains.  (Tr. 34–36.)  Ms. Chorovich testified that she gets dizzy and falls every couple months.  (Tr. 35.)  Ms. Chorovich gets headaches accompanied by symptoms of nausea, vomiting, and blackouts.  (*Id.*)  Ms. Chorovich also has arthritis in her feet, knees, and hands, which causes swelling and pain.  (Tr. 36–37.)  Ms. Chorovich can sometimes alleviate the swelling and pain in her feet and knees by elevating her feet.  (Tr. 37.)  Ms. Chorovich also described her fibromyalgia as "terrible pain" affecting her entire body.  (*Id.*)  Ms. Chorovich identified the pain as worst in her shoulder, neck, and knees.  (*Id.*)  She also has pain in her lower back that radiates into her right leg.  (Tr. 40.)  Ms. Chorovich explained she cannot go grocery shopping because of the pain, so her husband does the shopping.  (Tr. 38.)  Ms. Chorovich also testified to her depression, anxiety, and panic attacks.  (Tr. 38–40.)  Ms. Chorovich estimated she can stand for about twenty minutes and sit for about thirty minutes before needing to move around and stretch.  (Tr. 41.)  Ms. Chorovich also testified that she cannot walk very far due to swelling in her hands and feet.  (*Id.*)  Ms. Chorovich stated that she does not lift any weight over five pounds due to pain at the site of her pacemaker.  (Tr. 42.)  Finally, Ms. Chorovich reported she can perform household chores in increments but can only do a little at a time because of shortness of breath and pain.  (Tr. 41–42.)

In August 2012, Ms. Chorovich stated during a psychological consultative examination that her activities of daily living included some household chores, caring for her cat, spending time with her husband and friends, reading, and swimming on the weekends.  (Tr. 336.)

## STANDARD OF REVIEW

42 U.S.C. § 405(g) provides for judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA").  The Court reviews the Commissioner's decision

10

to determine whether the record as a whole contains substantial evidence in support of the

Commissioner's factual findings and whether the SSA applied the correct legal standards.  42

U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).  The Commissioner's

findings shall stand if supported by substantial evidence.  42 U.S.C. § 405(g).

Adequate, relevant evidence that a reasonable mind might accept to support a conclusion

constitutes substantial evidence, and "[e]vidence is insubstantial if it is overwhelmingly

contradicted by other evidence."  *O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir. 1994).  The

standard "requires more than a scintilla, but less than a preponderance."  *Lax*, 489 F.3d at 1084.

"Evidence is not substantial if it is overwhelmed by other evidence—particularly certain types of

evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but

mere conclusion."  *Gossett v. Bowen*, 862 F.2d 802, 805 (10th Cir. 1988) (internal quotation

marks and citations omitted).  Moreover, "[a] finding of 'no substantial evidence' will be found

only where there is a conspicuous absence of credible choices or no contrary medical evidence."

*Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (internal quotation marks and citations

omitted).

Although the reviewing court considers "whether the ALJ followed the specific rules of

law that must be followed in weighing particular types of evidence in disability cases," the court

"will not reweigh the evidence or substitute [its] judgment for the Commissioner's."  *Lax*, 489

F.3d at 1084 (internal quotation marks and citations omitted).  The court will "review only the

*sufficiency* of the evidence."  *Oldham v. Astrue,* 509 F.3d 1254, 1257 (10th Cir. 2007).  The

Court does not have to accept the Commissioner's findings mechanically but must "examine the

record as a whole, including whatever in the record fairly detracts from the weight of the

[Commissioner's] decision and, on that basis, determine if the substantiality of the evidence test

has been met." *Glenn v. Shalala*, 21 F.3d 983, 984 (10th Cir. 1994) (internal quotation marks and citation omitted).  "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence,'" and the court may not "displace the agenc[y's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.'" *Lax*, 489 F.3d at 1084 (quoting *Zoltanksi v. FAA*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

In addition to a lack of substantial evidence, the Court may reverse where the Commission uses the wrong legal standards, or the Commissioner fails to demonstrate reliance on the correct legal standards.  *See Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994); *Thompson v. Sullivan*; 987 F.2d 1482, 1487 (10th Cir. 1993); *Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1047 (10th Cir. 1993).

## ANALYSIS

The Social Security Act ("Act") defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Moreover, the Act considers an individual disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  *Id.* § 423(d)(2)(A).

In determining whether a claimant qualifies as disabled within the meaning of the Act, the SSA employs a five-part sequential evaluation.  *See* 20 C.F.R. § 404.1520;

*Bowen*, 844 F.2d 748, 750–53 (10th Cir. 1988); *Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).

The analysis evaluates whether:

(1) The claimant presently engages in substantial gainful activity;
(2) The claimant has a medically severe physical or mental impairment or impairments;
(3) The impairment is equivalent to one of the impairments listed in the appendix of the relevant disability regulation which preclude substantial gainful activity;
(4) The impairment prevents the claimant from performing his or her past work; and
(5) The claimant possesses a residual functional capacity to perform other work in the national economy considering his or her age, education, and work experience.

*See* 20 C.F.R. § 404.1520(a)(4).  The claimant has the initial burden of establishing the disability in the first four steps.  *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir. 1989).  At step five, the burden shifts to the Commissioner to show that the claimant retains the ability to perform other work existing in the national economy.  *Id.*

The ALJ evaluated Ms. Chorovich's claim through step five, making the following relevant findings of fact and conclusions of law with respect to Ms. Chorovich:

1. "Through the date last insured, [Ms. Chorovich] had the following medically determinable impairments:  hypertension, fibromyalgia, atrial fibrillation, status post pacemaker implant in 2001, multiple joint arthritis, degenerative disc disease of the cervical and lumbar spine and mood disorder.  (20 CFR 404.1520(c))."  (Tr. 14.)
2. "[Ms. Chorovich] did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526)."  (Tr. 15.)
3. "[Ms. Chorovich] had the residual functional capacity to lift and/or carry twenty pounds occasionally, ten pounds frequently, stand and/or walk for two hours in an 8-hour workday and sit for six hours in an 8-hour workday.  She needed to alternate between sitting and standing at fifteen to thirty minute interval[s].  She was, also, limited to simple repetitive tasks."  (Tr. 16.)
4. "[Ms. Chorovich] was unable to perform any past relevant work.  (20 CFR 404.1565)."  (Tr. 20.)
5. "Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Ms. Chorovich] is 'not disabled,' whether or not the claimant has transferable job skills[.]  (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2)."  (*Id.*)

6. "Through the dated last insured, considering [Ms. Chorovich's] age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that [Ms. Chorovich] could have performed.  (20 CFR 404.1569 and 404.1569(a))."  (*Id.*)

7. "[Ms. Chorovich] was not under a disability, as defined in the Social Security Act, at any time from September 21, 2010, the alleged onset date, through September 30, 2013, the date last insured (20 CFR 404.1520(g))."  (Tr. 21.)

In short, the ALJ concluded that Ms. Chorovich could not perform her past work as a day care worker based on the RFC assessed, but she could perform jobs that existed in significant numbers in the national economy, including representative occupations such as a general office worker, charge account clerk, and information clerk.  (Tr. 20–21.)

In support of her claim that the Court should remand the Commissioner's decision, Ms. Chorovich argues the ALJ erred by:  (1) failing to give proper weight to the medical evidence, particularly the opinions from her treating physicians; and (2) failing to make sufficient findings to support his assessment of Ms. Chorovich's credibility.[3]  (Pl.'s Br. 15–22, ECF No. 22.)  The undersigned addresses these contentions in reverse order, starting with the ALJ's evaluation of Ms. Chorovich's credibility, followed by the ALJ's evaluation of the medical evidence.

### A.  The ALJ's Evaluation of Ms. Chorovich's Credibility

Ms. Chorovich argues the ALJ did not evaluate her credibility properly.  (Pl.'s Opening Br. 20–22, ECF No. 22.)  The undersigned finds the ALJ explained why he discounted Ms. Chorovich's testimony and supported his opinion with citations to substantial evidence in the record.

---

[3] By addressing only these points of alleged error in her opening brief, Ms. Chorovich waived any additional challenges to the ALJ's decision because doing so deprives the opponent of the opportunity to address the arguments.  *See Anderson v. Dep't of Labor*, 422 F.3d 1155, 1182 n.51 (10th Cir. 2005) (failing to raise appeal issues in opening brief waives those points).

"'Credibility determinations are peculiarly the province of the finder of fact, and [a court] will not upset such determinations when supported by substantial evidence.'" *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir. 1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)).   "However, '[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" *Id.* (quoting *Huston v. Bowen*, 838 F.2d 1125, 1133 (10th Cir. 1988)).   If objective medical evidence shows a medical impairment that produces pain, the ALJ must consider the claimant's assertions of severe pain and decide the extent to which the ALJ believes the claimant's assertions.   *Id.*   To make this analysis, the ALJ should consider such factors as

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Id.* (quoting *Hargis v. Sullivan*, 945 F.2d 1482, 1489 (10th Cir. 1991)).   But this analysis "does not require a formalistic factor-by-factor recitation of the evidence.   So long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the dictates of *Kepler* are satisfied." *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

The ALJ found Ms. Chorovich's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [Ms. Chorovich's] statements concerning the intensity, persistence and limiting effects of these systems are not entirely credible."  (Tr. 20.)  Ms. Chorovich argues that the ALJ made insufficient credibility findings because the ALJ did not consider the combined impact of all her impairments, particularly her fibromyalgia and musculoskeletal conditions.  (Pl.'s Br. 22, ECF No. 22.)  In the Decision, the ALJ did consider

15

Ms. Chorovich's fibromyalgia and musculoskeletal conditions, among her other severe impairments, and concluded that the medical record did not support Ms. Chorovich's allegations that the combination of impairments proved so severe as to disable her.  (Tr. 16–19.)

Ms. Chorovich also argues that the ALJ improperly discounted the treating physicians' conclusions that Ms. Chorovich had extensive abnormalities, which aligned with Mr. Chorovich's own statements concerning her disability.  (*Id.*)  The ALJ found Ms. Chorovich's alleged symptoms and functional limitations disproportionate to the objective findings of the medical record and inconsistent with the medical evidence.  (Tr. 19.)  The ALJ identified objective medical evidence showing that medication controlled Ms. Chorovich's hypertension, her pacemaker controlled her atrial fibrillation, and diagnostic testing revealed a normal heart and only mild degenerative changes in her lumbar spine.  (Tr. 17.)  As discussed below, the ALJ gave the opinions of Dr. Cholak, Dr. Sayegh, and Dr. Stainbrook little weight where they diverged from the treatment notes and any diagnostic testing.  (Tr. 18.)

Finally, Ms. Chorovich argues the ALJ improperly considered Ms. Chorovich's ability to perform some activities of daily living and the circumstances of her ceasing work due to lay off as opposed to disability.  (*Id.*)  The ALJ considered Ms. Chorovich's daily activities reported during a psychological examination by Mr. Spindler.  (Tr. 19–20, 333–40.)  The ALJ found Ms. Chorovich's daily activities included attending to some light household chores, taking care of her cats, talking and visiting with several friends, and engaging in hobbies like reading and swimming on the weekends.  (Tr. 19, 336.)  As the government points out, the ALJ relied on these activities as one factor in the analysis of Ms. Chorovich's alleged disability, along with the findings from the medical record as a whole.  (Def.'s Answer Br. 11, ECF No. 30; *see* tr. 16–20.) The ALJ gave similar consideration to Ms. Chorovich's termination due to a lay off as opposed

16

to disability.  The ALJ simply noted as one of the factors underlying the credibility analysis that Ms. Chorovich stopped working for reasons not related to the alleged disabling impairments. (Tr. 20.)  Thus, the ALJ linked his finding that Ms. Chorovich's statements were "not entirely credible" with specific record evidence, including objective medical reports, Ms. Chorovich's daily activities, and the circumstances surrounding Ms. Chorovich's separation from work.  (*See* tr. 16–20; *Hackett*, 395 F.3d at 1173 (upholding ALJ's finding claimant "not fully credible" where the ALJ relied to claimant's daily activities and contradictions therein, as well as medical evidence showing stabilized physical issues, mental impairments well-controlled with medication, and conservative pain treatment)).

The undersigned RECOMMENDS the District Judge find substantial evidence supports the ALJ's evaluation of Ms. Chorovich's credibility.

### B.  The ALJ's Evaluation of the Treating Physicians' Opinions

Ms. Chorovich contends the ALJ failed to provide substantial evidence to support the decision to accord "little weight" to the opinions of her treating physicians, Dr. Cholak, Dr. Sayegh, and Dr. Stainbrook.  (Pl.'s Br. 15–20, ECF No. 22.)  The undersigned disagrees.

Without question, an ALJ must evaluate every medical opinion.  20 C.F.R. § 404.1527(c).  If the ALJ finds a treating physician's opinion "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [] not inconsistent with the other substantial evidence in [the] case record," the ALJ must give the opinion controlling weight.  20 C.F.R. § 404.1527(c)(2).  When the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider certain factors.  20 C.F.R. § 404.1527(c) provides these factors:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to

17

which the physician's opinion is supported by relevant evidence; (4) consistency
between the opinion and the record as a whole; (5) whether or not the physician is
a specialist in the area upon which an opinion is rendered; and (6) other factors
brought to the ALJ's attention which tend to support or contradict the opinion.

See *Watkins v. Barnhart*, 350 F.3d 1297, 1300–01 (10th Cir. 2003) (quoting *Drapeau v.
Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001)).   To reject a medical opinion, the ALJ must
provide "'specific, legitimate reasons.'"  *Drapeau*, 255 F.3d at 1213 (quoting *Miller v. Chater*,
99 F.3d 972, 976 (10th Cir. 1996)).

Yet the ALJ's decision need not discuss explicitly all of the factors for each of the
medical opinions.  See *Oldham*, 509 F.3d at 1258 (stating that a lack of discussion of each factor
does not prevent the court from according the decision meaningful review).  When considering
medical opinion evidence, the ALJ must weigh and resolve evidentiary conflicts and
inconsistencies.  See *Richardson v. Perales*, 402 U.S. 389, 399 (1971) (reflecting the ALJ's duty
to resolve conflicting medical evidence).

Here, the ALJ did not accord controlling weight to Ms. Chorovich's treating medical
providers' opinions.  (*See* tr. 18.)  However, the ALJ did not summarily reject the opinions from
the treating sources, as Ms. Chorovich argues; instead, the ALJ's decision granted "little weight"
to each of the treating physicians' opinions.  (Tr. 17–18.)  The ALJ explained Dr. Cholak, Dr.
Sayegh, and Dr. Stainbrook took positions inconsistent with the record as a whole.  (Tr. 18.)  The
ALJ also noted that "Dr. Cholak and Dr. Stainbrook's own treatment notes failed to reveal the
type of significant clinical and laboratory abnormalities one would expect if [Ms. Chorovich]
were in fact disabled."  (*Id.*)  These reasons, along with the ALJ's analysis of contrary, well-
supported medical evidence, satisfy the ALJ's obligation to provide explanation for the weight
given to the treating sources' opinions.  See *Oldham*, 509 F.3d at 1258 ("The ALJ provided good

reasons in his decision for the weight he gave to the treating sources' opinions. Nothing more was required in this case." (citation omitted)).

       1.    *Dr. Cholak*

Ms. Chorovich contends that the ALJ erred in weighing Dr. Cholak's opinion because Dr. Cholak based his opinion on appropriate and uncontroverted clinical evidence of all-over achiness, chest pain, and headache. (Pl.'s Br. 17, ECF No. 22; tr. 538.) Ms. Chorovich points the Court to Dr. Cholak's opinions set forth in the Multiple Impairment Questionnaire from March 2012 to support Dr. Cholak's conclusion that Ms. Chorovich could not work. (Pl.'s Br. 17, ECF No. 22; tr. 538–45.) However, the ALJ cited Dr. Cholak's treatment notes from Ms. Chorovich's regular checkups between 2009 and 2013, (tr. 381–474, 562–93), and found they did not "reveal any significant findings" to support Ms. Chorovich's allegations that her impairments became so severe on or after September 21, 2010 as to disable her. (Tr. 17.) The ALJ further noted that the diagnostic testing showed normal sensation and only mild degenerative changes. (*Id.*)

As the government points out, the ALJ relied on Dr. Cholak's treatment notes that show a period from late 2011 to early 2012 where Dr. Cholak found Ms. Chorovich had musculoskeletal limitations in her back and upper and lower extremities, among other continuing abnormalities; however, the records show that Ms. Chorovich's condition improved to normal in those areas by mid-2012. (Def.'s Br. 6, ECF No. 30; tr. 17.) The medical evidence supports the ALJ's discussion of Dr. Cholak's findings. (*Compare* tr. 382–90 (June 2012), *with* 406–10 (March 2012), 416–20 (November 2011), 425–29 (October 2011).) The ALJ found that Dr. Cholak's treatment notes revealed

arthritic deformities in bilateral upper and lower extremities with decreased range of motion and crepitus in the lower extremities.  [Ms. Chorovich] also had decreased range of motion and tenderness in her back.  However, [Ms. Chorovich] otherwise had normal neurologic examination, normal stability, normal gait and normal muscle strength and tone.

(Tr. 17.)  The ALJ then noted that Dr. Cholak's treatment notes during 2012 and 2013 revealed that Ms. Chorovich had improved, with Ms. Chorovich having a "full range of motion, with normal gait, normal strength and no deformity or stiffness."  (*Id.*; tr. 386–90, 568–70, 574–76, 581–82, 590–92.)  After summarizing the extreme functional limitations that Dr. Cholak imposed in 2012 and 2013 questionnaires, the ALJ found Dr. Cholak's opinion inconsistent with the record as a whole, explaining again that Dr. Cholak's treatment notes "failed to reveal the type of significant clinical and laboratory abnormalities one would expect if the claimant were in fact disabled."  (Tr. 18.)  Substantial objective evidence in the record supports that ALJ's decision to assign little weight to Dr. Cholak's opinions in the impairment questionnaire and to his conclusion that Ms. Chorovich could not work.  *See Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (upholding ALJ's decision to accord less than controlling weight to a treating physician where the physician based her opinion on plaintiff's subjective reports and conflicted with the physician's own written narrative reports, as well as another treating physician's treatment notes).

### 2.    Dr. Sayegh

The ALJ also gave little weight to Dr. Sayegh's opinion, Ms. Chorovich's treating pain specialist.  (Tr. 18.)  In arguing that the ALJ erred in his analysis, Ms. Chorovich points the Court to Dr. Sayegh's Multiple Impairments Questionnaire, (tr. 491–92), and supporting x-rays.  (Pl.'s Br. 17, ECF No. 22.)

In the Decision, the ALJ discussed Dr. Sayegh's findings during his neurological examinations of Ms. Chorovich.  (Tr. 17.)  However, the ALJ found Dr. Sayegh's opinions inconsistent with the record as a whole and gave ample reasons for according Dr. Sayegh's opinion little weight.  (Tr. 17–18.)  First, Dr. Sayegh's neurological findings conflict with Dr. Cholak's neurological and musculoskeletal examinations from the same period in 2013.  (Tr. 17; *compare* tr. 578–84, 586–92 *with* tr. 548–53, 491–92.)  Moreover, the ALJ found no diagnostic testing that demonstrated Ms. Chorovich's allegedly decreased sensations in her four extremities, or her severe neck and back symptoms.  (Tr. 17.)  On the contrary, the ALJ pointed out that an x-ray of Ms. Chorovich's lumber spine in August 2011 – the same x-ray Dr. Sayegh relied on – revealed only mild degenerative change.  (Tr. 17; tr. 511.)  In addition, an electromyography (EMG) / nerve conduction velocity (NCV) study of Ms. Chorovich's left upper extremity in September 2011 showed normal results, and Ms. Chorovich refused an EMG/NCV study on the right side.  (Tr. 17; tr. 527–28.)  Finally, the ALJ pointed out that "despite the severe symptoms noted by Dr. Sayegh, [Ms. Chorovich] continued to receive only conservative treatment."  (Tr. 17; *see* tr. 548–60, 596–97.)

Thus, the ALJ explicitly considered and relied on factors set forth in 20 C.F.R. § 404.1527(c).  Additionally, the ALJ resolved conflicts in Dr. Sayegh's and Dr. Cholak's treatment notes, which the ALJ must do.  *See, e.g.*, *Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (reflecting ALJ's resolution of evidentiary conflicts between medical providers). The ALJ provided an extended explanation of his decision, supported by substantial record evidence.

### 3.    Dr. Stainbrook

Ms. Chorovich also argues that the ALJ erred in giving "little weight" to the opinions of her treating rheumatologist, Dr. Stainbrook.  Ms. Chorovich argues Dr. Stainbrook's treatment records support the limitations Dr. Stainbrook described for Ms. Chorovich.  (Pl.'s Br. 17, ECF No. 22.)

Like the opinions of Dr. Cholak and Dr. Sayegh, the ALJ found Dr. Stainbrook's opinions inconsistent with the record as a whole, and Dr. Stainbrook's treatment notes did not reveal abnormalities of a disabling nature.  (Tr. 18.)  Substantial evidence in the medical record supports this conclusion.  (*See* tr. 320–23, 499–526.)

The Tenth Circuit has approved an ALJ's rejection of a treating physician's opinion where it was "brief, conclusory, and unsupported by medical evidence."  *See Griner v. Astrue*, 281 F. App'x 797, 800 (10th Cir. 2008) (quoting *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988)).  The record contains Dr. Stainbrook's notes from three office visits, (tr. 320–23), and the ALJ specifically stated these notes do not support the significant functional limitations one would expect from someone "in fact disabled."  (Tr. 18.)  The brief and conclusory records cited provide substantial evidence to support that determination.

### 4.    State agency physicians

The ALJ also considered the non-examining state agency physicians' opinions in assessing Ms. Chorovich's RFC.  (Tr. 17–18.)  Ms. Chorovich argues that the non-examining state agency medical consultants provided the only contradictory medical evidence credited by the ALJ and that the ALJ may not give greater weight to the opinions of non-treating, non-examining physicians than that given to the well-supported opinions of treating physicians.  (Pl.'s Br. 18–19, ECF No. 22.)

As discussed in the sections above, the ALJ provided sufficiently specific, legitimate reasons for according little weight to the treating physicians' opinions, supported by substantial record evidence, including the treatment notes of the physicians themselves.  In addressing the opinions of the non-examining physicians, the ALJ stated he considered the findings of the state agency consultants and "afforded [them] weight as the opinion of a nonexamining expert."  (Tr. 17.)  "[T]he administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant . . . as the administrative law judge must do for any opinions from treating sources . . . ."  20 C.F.R. § 404.1527(e)(2)(ii); *see Hamlin v. Barnhart*, 365 F.3d 1208, 1223 (10th Cir. 2004) ("If an ALJ intends to rely on a nontreating physician or examiner's opinion, he must explain the weight he is giving to it.")  In assigning weight to the state agency physicians, the ALJ cited SSR 96-6p, 1996 WL 374180 (July 2, 1996), thus acknowledging his obligation to assign and explain the weight given to state agency physicians.  (Tr. 17.)  While the ALJ did not specify the exact weight accorded the non-examining physicians, his opinion makes clear he did not give them controlling weight given his acknowledgment that they did not examine Ms. Chorovich.  (Tr. 17.)  Further, while the ALJ's RFC differs slightly from that given by the state agency physicians, it provides additional limitations, such as those on lifting and carrying.  (*Compare* tr. 16, 20–21 *with* tr. 92, 106.)

Some of the agency physicians' limitations do not appear specifically in the ALJ's RFC, *i.e.*, climbing limitations, temperature constraints, environmental and hazardous conditions.  (*Id.*)  Despite their absence, the proposed jobs Ms. Chorovich can perform exclude all those factors, making their absence irrelevant.  (*Compare* tr. 16, 20–21, 92, 106 *with* DOT 209.587-010, 1991 WL 671797 (Addresser), DOT 205.367-014, 1991 WL 671715 (Charge-Account Clerk), DOT 205.367-018, 1991 WL 671716 (Claims Clerk II).)  The only missing element is the restriction

23

on overhead lifting, which the ALJ addressed at the hearing and Ms. Chorovich's counsel explained grew out of the pacemaker issues.  (Tr. 42–43.)  Given the ALJ discredits Ms. Chorovich's continuing cardiac complaints, the opinion makes clear why the ALJ omits the limitation on overhead lifting.  (*See* tr. 17 (finding claimant's complaints regarding atrial fibrillation and hypertension unsupported).)  Where the opinion makes the missing weight apparent, the Tenth Circuit has found no error.  *See Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014) (upholding an ALJ's decision despite the absence of an express controlling weight analysis of a treating physician's opinion).  Thus, the ALJ obviously gave the agency physicians some but not controlling weight and acknowledged their limitations as non-treating physicians.

Ms. Chorovich also asserts that the state agency physicians here reviewed an incomplete record, containing treatment notes only through May 2012 or October 2012.  (Pl.'s Br. 18–19, ECF No. 22.)  First, Dr. William Bolz reviewed records of treatment through at least June 29, 2012, as evidenced by his reference to a record of that date, and rendered an opinion on September 5, 2012.  (Tr. 89, 95.)  Dr. Teresita Cruz reviewed the updated records on January 7, 2013, including records from October 2012.  (Tr. 103, 108.)  Given how a social security claim proceeds, the non-treating agency physicians will rarely have the benefit of the complete record because their role comes earlier in time than the ALJ's assessment.  The ALJ discussed the functional limitations identified by the consultants and made his determinations in light of them in addition to the objective medical evidence, the partial weight accorded the treating physicians, and the record as a whole.  (Tr. 17–18.)  Thus, this absence does not change the basis for the ALJ's decision.

Finally, Ms. Chorovich asserts that even if the ALJ did not err in refusing to give the treating source doctors controlling weight, their opinions still deserve deference, and the ALJ

must weigh their opinions using all of the 20 C.F.R. § 404.1527 factors.  (Pl.'s Br. 19–20, ECF No. 22.)  The undersigned finds that the ALJ gave a detailed discussion of the weight he accorded the treating physicians.  Case law clearly holds that the ALJ need not expressly apply each § 404.1527 factor in weighing a medical opinion and that a lack of discussion of each factor does not prevent the court from according the decision meaningful review.  *Oldham*, 509 F.3d at 1258.  The record reflects that the ALJ considered the regulatory factors in considering the weight of the treating physicians' opinions, and the ALJ provided specific, legitimate reasons for according them little weight.

The ALJ provided enough detail to permit this Court to review his findings to see if substantial evidence supports them.  Thus, the undersigned RECOMMENDS the District Judge find no error in the ALJ's evaluation of the medical evidence.

## RECOMMENDATION

Because the ALJ followed the law and substantial evidence supported his opinion, the undersigned RECOMMENDS the Court affirm the Commissioner's decision.

The Court will send copies of this Report and Recommendation to the parties, and hereby notifies them of their right to object to the same.  The Court further notifies the parties that they must file any objection to this Report and Recommendation with the clerk of the court, pursuant to 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), within fourteen (14) days of service thereof.  Failure to file objections may constitute waiver of objections upon subsequent review.

DATED this 4th day of March, 2016.

BY THE COURT:

EVELYN J. FURSE
United States Magistrate Judge